# UNITED STATES DISTRICT COURT
## FOR THE
### MIDDLE DISTRICT OF PENNSYLVANIA

DANNY KOZIEL,                    :
                                 :
          Plaintiff              :    No. 1:13-CV-02460
                                 :
     vs.                         :    (Judge Kane)
                                 :
CAROLYN W. COLVIN, ACTING        :
COMMISSIONER OF SOCIAL           :
SECURITY,                        :
                                 :
          Defendant              :

## MEMORANDUM

## Background

          The above-captioned action is one seeking review of a
decision of the Commissioner of Social Security ("Commissioner")
denying Plaintiff Danny Koziel's claim for social security
disability insurance benefits and supplemental security income
benefits.

          Disability insurance benefits are paid to an individual
if that individual is disabled and "insured," that is, the
individual has worked long enough and paid social security taxes.
The last date that a claimant meets the requirements of being
insured is commonly referred to as the "date last insured."  It is
undisputed that Koziel met the insured status requirements of the
Social Security Act through December 31, 2013. Tr. 12, 14 and
149.[1]

---

1.  References to "Tr.___" are to pages of the administrative
record filed by the Defendant on November 26, 2013.

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes).  It is designed to help aged, blind or other disabled individuals who have little or no income.

On November 3, 2010, Koziel protectively filed[2] his applications for disability insurance benefits and supplemental security income benefits. Tr. 11, 56-57, 132-138, and 149. On January 13, 2011, the applications were initially denied by the Bureau of Disability Determination.[3] Tr. 59-68.  On March 10, 2011, Koziel requested a hearing before an administrative law judge. Tr. 11 and 70-71.  After 13 months had passed, a hearing was held on April 11, 2012. Tr. 25-55.  Koziel was represented by counsel at the hearing. Id.  On July 26, 2012, the administrative law judge issued a decision denying Koziel's applications. Tr. 11-20.  As will be explained in more detail *infra*, the administrative law judge found that Koziel failed to prove that he met the requirements of a listed impairment or suffered from work-preclusive functional limitations through the date of the decision. Tr. 15-19. Instead Koziel had the ability to engage in a

---

2.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

3.  The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits and supplemental security income benefits on behalf of the Social Security Administration.  Tr. 60 and 65.

the full range of work from an exertional standpoint[4] but was

---

4.  The terms sedentary, light, medium, heavy and very heavy work
are defined in the regulations of the Social Security
Administration as follows:

>    (a) *Sedentary work*. Sedentary work involves lifting no
>    more than 10 pounds at a time and occasionally lifting
>    or carrying articles like docket files, ledgers, and
>    small tools.  Although a sedentary job is defined as
>    one which involves sitting, a certain amount of walking
>    and standing is often necessary in carrying out job
>    duties.  Jobs are sedentary if walking and standing are
>    required occasionally and other sedentary criteria are
>    met.
>
>    (b) *Light work*.  Light work involves lifting no more
>    than 20 pounds at a time with frequent lifting or
>    carrying of objects weighing up to 10 pounds.  Even
>    though the weight lifted may be very little, a job is
>    in this category when it requires a good deal of
>    walking or standing, or when it involves sitting most
>    of the time with some pushing and pulling of arm or leg
>    controls. To be considered capable of performing a full
>    or wide range of light work, you must have the ability
>    to do substantially all of these activities. If someone
>    can do light work, we determine that he or she can also
>    do sedentary work, unless there are additional limiting
>    factors such as loss of fine dexterity or inability to
>    sit for long periods of time.
>
>    (c) *Medium work*.  Medium work involves lifting no more
>    than 50 pounds at a time with frequent lifting or
>    carrying of objects weighing up to 25 pounds.  If
>    someone can do medium work, we determine that he or she
>    can do sedentary and light work.
>
>    (d) *Heavy work*.  Heavy work involves lifting no more
>    than 100 pounds at a time with frequent lifting or
>    carrying of objects weighing up to 50 pounds. If
>    someone can do heavy work, we determine that he or she
>    can also do medium, light, and sedentary work.
>
>    (e) *Very heavy work*. Very heavy work involves lifting
>    objects weighing more than 100 pounds at a time with
>    frequent lifting or carrying of objects weighing 50
>    pounds or more.  If someone can do very heavy work, we
>    determine that he or she can also do heavy, medium,

(continued...)

limited to work involving simple instructions. Tr. 16.  On August 7, 2012, Koziel filed a request for review with the Appeals Council, and after 12 months had elapsed, the Appeals Council on August 16, 2013, concluded that there was no basis upon which to grant Koziel's request for review. Tr. 1-4, 7 and 224.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Koziel then filed a complaint in this court on September 25, 2013.  Supporting and opposing briefs were submitted and the appeal[5] became ripe for disposition on April 28, 2014, when Koziel elected not to file a reply brief.

Koziel was born in the United States on March 15, 1985, and at all times relevant to this matter was considered a "younger individual"[6] whose age would not seriously impact his ability to adjust to other work. 20 C.F.R. §§ 404.1563(c) and 416.963(c). Tr. 30, 56, 132 and 139.

---

4.   (...continued)
      light and sedentary work.

2 C.F.R. §§ 404.1567 and 416.967.

5.  Under the Local Rules of Court, "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

6.  The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). At the time of the administrative hearing Koziel was 27 years of age. Tr. 31.

Koziel, in documents filed with the Social Security Administration, claimed that he became disabled from performing full-time gainful employment on April 18, 2008, because of antisocial behavior, anger problems, anxiety, a learning disability, abscessed teeth and chronic diarrhea. Tr. 132 and 153.

Koziel attended school in the Montrose Area School District, Montrose, Pennsylvania. Tr. 154. Although Koziel attended special education classes during his elementary and secondary schooling, he graduated from high school on June 11, 2004, can read, write, speak and understand the English language and at least perform basic mathematical functions such as counting change, paying bills and using a checkbook and money orders.[7] Tr. 152, 154 and 188.

On April 18, 2000, when Koziel was in the 8th grade, it was reported that he received learning support during his primary schooling. Tr. 189. During the 8th grade he was "part of the inclusion classes for all his academic subjects" and his "cognitive and physical development [was] age appropriate." Id. It was also noted with respect to his 8th grade performance that he had "good math skills when he [decided] to apply himself." Id. Koziel's official school transcript for the 9th through 12th grades reveals that he had a B average and that his cumulative class rank during his senior year was 34 out of 139 students. Id. In 9th

---

7.   In 10th grade Koziel received a C in pre-Algebra and in 11th grade a B in Geometry. Tr. 188.

grade he missed 3 days of school; 10th grade 2 days; 11th grade 3 days and 12th grade 9.5 days. Id.

Prior to entering the 12th grade there was an Individualized Education Program (IEP) developed for him in which it was stated with respect to his 11th grade performance as follows: "Dan attended all regular education classes this year and is the best year Dan has had yet.  He has become so much more independent in the completion of his work and in test taking. His teachers think he is a wonderful person." Tr. 166.  Furthermore, with respect to why an IEP was developed for him it was stated as follows:

> Dan has difficulty with written expression and [his]reading skills are a bit below grade level. He may require extended time for testing if [a] test involves a lot of reading. Dan needs aid to proofread written assignments before being handed in for grading and a calculator for math. He also requires access to a resource period.

Id.  The learning support for Koziel involved small group testing, having instructions read to him, and the use of a calculator. Tr. 175.  After graduating from high school, Koziel did not complete "any type of special job training, trade or vocational school." Tr. 154.

Koziel's work history covers 5 years and 2 different employers. Tr. 141-147 and 192-195.  The records of the Social Security Administration reveal that Koziel had earnings in the years 2003 through 2008. Tr. 147.  Koziel's annual earnings range

from a low of $1153.60 in 2003 to a high of $13,703.56 in 2005 Id. Koziel's total earnings during those 6 years were $55,679.49. Id.

In documents filed with the Social Security Administration, Koziel reported that he worked 8 hours per day, 5 days per week, as a custodian for a school during the summer of 2003 and from the summer of 2004 to April, 2005; he also worked as a custodian for a manufacturing company from April, 2005 to April, 2008. Tr. 154 and 192-195. Koziel reported that he stopped working as a custodian at the manufacturing plant on April 18, 2008, because the plant closed down. Tr. 153.  After Koziel's employment as a custodian ended, the record reveals that he worked part-time mowing grass at cemeteries. Tr. 54 and 279.  The record also reveals that Koziel then received unemployment compensation benefits for almost 2 years.[8] Id.

Koziel has past relevant employment[9] as a custodian or janitor which, based on Koziel's written description thereof, was

---

8.  An individual can only collect unemployment compensation if the individual is able and willing to accept work. 43 P.S. §801(d)(1). Although receipt of workers' compensation benefits does not preclude an award of disability insurance or supplement security income benefits, an administrative law judge may consider receipt of such benefits when judging a claimant's credibility.

9.  Past relevant employment in the present case means work performed by Koziel during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

semiskilled to unskilled work[10] and at least medium work from an exertional standpoint.[11] Tr. 58 and 193-194.

　　　At the time of the administrative hearing, Koziel was working at a livestock farm part-time for approximately two hours per day.[12] Tr. 31-32. He was living approximately a mile from the farm in a trailer located on the property of a couple, Thomas and Cindy Cantone, who treated him as their son. Tr. 43-54. Koziel first became acquainted with the Cantones when he worked as a school custodian. Tr. 279

　　　In a document entitled "Function Report - Adult" and dated December 13, 2010, Koziel reported that he spent his days playing video or computer games. Tr. 196. He reported no problem with personal care, including dressing, bathing, shaving,and feeding himself.　He performed light housework and yard work such

---

10.　"The Social Security Administration has taken administrative notice of the reliability of the job information contained in the Dictionary of Occupational Titles . . . and often relies upon it . . . ." Burns v. Barnhart, 312 F.3d 113, 126 (3d Cir. 2002). Koziel stated that he "swept, dusted, emptied trash, vacuumed and washed furniture." Tr. 193. The Dictionary of Occupational Titles describes such a position as unskilled to semiskilled work. See Dictionary of Occupational Titles Nos. 389.683-010 (Sweeper-Cleaner, Industrial), 382-664-010 (Janitor (any industry)), and 381-687-018 (Cleaner, Industrial (any industry)). Dictionary of Occupational Titles (4th Ed., Rev. 1991), 3 Service Occupations, 363.681-10 to 389.687-018, http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT03B.HTM(Last accessed September 15, 2014).

11.　Koziel reported that he would stand or walk 8-hours during a workday; the most he lifted was 50 pounds; and he frequently lifted 30 pounds. Tr. 193-194.

12.　Koziel testified that he worked at a "heifer barn" cleaning out feeding troughs and feeding the heifers. Tr. 39.

as cleaning, sweeping, moping floors and mowing the lawn. Tr. 198. He fed and cared for his cat and took it to the veterinarian. Tr. 197. He was able to prepare his own meals. Tr. 199. He was able to walk 1 mile before needing to stop and rest. Tr. 201. In the function report, Koziel when asked to check items which his "illnesses, injuries, or conditions affect" did <u>not</u> check lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, hearing, stair climbing, seeing, following instructions and using his hands. Tr. 201.  Although in the function report, Koziel stated that he did not have a driver's license because he failed the driver's test, at the administrative hearing he reported that he was able to drive.[13] Tr. 32-33.

    For the reasons set forth below we will affirm the Commissioner.

**<u>Standard of Review</u>**

    When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. <u>See</u> <u>Poulos v. Commissioner of Social Security</u>, 474 F.3d 88, 91 (3d Cir. 2007); <u>Schaudeck v. Commissioner of Social Sec. Admin.</u>, 181 F.3d 429, 431 (3d Cir. 1999); <u>Krysztoforski v. Chater</u>, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is

---

13.  In April, 2011, Koziel told his psychiatrist that he passed his driver's test and obtained a license. Tr. 332.  While working at the livestock farm he would routinely drive 1 mile to his trailer to use the bathroom even though there was a bathroom facility at the farm. Tr. 32-33.

to determine whether those findings are supported by "substantial evidence." <u>Id.</u>; <u>Brown v. Bowen</u>, 845 F.2d 1211, 1213 (3d Cir. 1988); <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); <u>Keefe v. Shalala</u>, 71 F.3d 1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)(quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. <u>Brown</u>, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight

10

of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**Sequential Evaluation Process**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

11

period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment or
> impairments are of such severity that he is not only
> unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in
> the national economy, regardless of whether such work
> exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or
> whether he would be hired if he applied for work.  For
> purposes of the preceding sentence (with respect to any
> individual), "work which exists in the national economy"
> means work which exists in significant numbers either in
> the region where such individual lives or in several
> regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in
evaluating disability insurance and supplemental security income
claims.  See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos,
474 F.3d at 91-92.  This process requires the Commissioner to
consider, in sequence, whether a claimant (1) is engaging in
substantial gainful activity,[14] (2) has an impairment that is
severe or a combination of impairments that is severe,[15] (3) has

---

14.  If the claimant is engaging in substantial gainful activity,
the claimant is not disabled and the sequential evaluation
proceeds no further.

15.   The determination of whether a claimant has any severe
impairments, at step two of the sequential evaluation process, is
a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a
claimant has no impairment or combination of impairments which
significantly limits the claimant's physical or mental abilities
to perform basic work activities, the claimant is "not disabled"
and the evaluation process ends at step two. Id. If a claimant
has any severe impairments, the evaluation process continues. 20
                                           (continued...)

12

an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[16] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four, the administrative law judge must determine the claimant's residual functional capacity. Id.[17]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other

---

15.  (...continued)
C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2).

16.  If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

17.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities.  Id; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**Medical Records**

Before we address the administrative law judge's decision and the arguments of counsel, we will review in detail Koziel's medical records.

Koziel has a history of medical treatment at Endless Mountain Health System, located in Montrose, Pennsylvania, since at least September 15, 2009. Tr. 228-229.  Documents filed by Koziel with the Social Security Administration reveal that he received treatment from at least two physicians, Hassan Khalil, M.D., and Ihab Dana, M.D., who were affiliated with Endless Mountain Health System. Tr. 156-158. From September 15, 2009, through July 1, 2010, Koziel had five appointments with and made two telephone calls to a medical provider affiliated with that health system. Tr. 229-231.  The treatment notes during this time period are handwritten and mostly illegible and the physician providing the care is not identified. Id. The court can discern that the appointment on September 15, 2009, was for a "driver permit physical." Tr. 229.  The legible portions of the medical notes of the other four appointments reveal that Koziel

14

consistently complained of stomach pain and diarrhea. Tr. 229-231.
The telephone messages on June 7 and July, 1, 2010, reveal that
Koziel was complaining of diarrhea or loose stools but also
reported that he stopped taking Imodium. Tr. 231-232.  The
telephone message from June 7 also reveals that Koziel had recent
laboratory work, which was "ok," and showed that he did not have
celiac disease.[18] Tr. 231. Koziel was advised to stay on Imodium.
Id.

On September 1, 2010, Koziel had an appointment with Dr.
Dana at which Koziel complained of having diarrhea "off and on for
months" after eating.[19] Tr. 232.  The objective physical
examination findings reported by Dr. Dana were completely normal,
indicating that Koziel had a soft, non-tender abdomen. Id.  Dr.
Dana's diagnostic assessment was that Koziel suffered from chronic
diarrhea. Id.  Dr. Dana ordered a "pancreatic insufficiency test[20]

---

18.  According to the Mayo Clinic website "[c]eliac disease is an
immune reaction to eating gluten, a protein found in wheat,
barley and rye." Celiac disease, Definition, Mayo Clinic Staff,
http://www.mayoclinic.org/diseases-conditions/celiac-disease/basi
cs/definition/con-20030410 (Last accessed September 18, 2014). In
individuals with celiac disease those substances trigger "an
immune response in [the] small intestine" and "[o]ver time[]
this reaction produces inflammation that damages the small
intestine's lining and prevents absorption of some nutrients
(malabsorption)." Id.

19.  The notes of this appointment and subsequent appointments
are mostly typewritten.

20.  Pancreatic insufficiency is defined in part as "a condition
characterized by inadequate production and secretion of
pancreatic hormones and enzymes. It usually occurs secondary to a
disease process destructive of pancreatic tissue. Nutritional
(continued...)

as well as a colonoscopy." Id.   At a follow-up appointment with Dr. Dana on September 24, 2010, Koziel was doing well other than continuing to have "a problem with diarrhea." Tr. 233. The results of a physical examination were completely normal. Id.

        On September 29, 2010, Koziel based on a referral from Dr. Dana was examined by Bruce Askey, a certified nurse practitioner, at the Department of Gastroenterology, Guthrie Clinic, Sayre, Pennsylvania, as a prelude to Koziel undergoing a colonoscopy. Tr. 233 and 240-242.  Koziel appeared at the appointment "with a women who identified herself as his 'adoptive mother, but not really'" and who did "most of the talking" but nurse Askey reported that he "tr[ied] to direct the questions to [Koziel a] 25 year old mentally competent gentleman." Tr. 240. Koziel reported two to four bowel movements per day, "primarily" after eating. Id.  Koziel denied "fevers, chills, night-sweats, weight loss, nausea, vomiting, melena,[21] hematochezia,[22]

---

20.  (...continued)
malabsorption, anorexia, poorly localized upper abdominal or epigastric pain, malaise, and severe weight loss often occur." Mosby's Medical Dictionary,___(8th Ed. 2009), http://medical-dictionary.thefreedictionary.com/pancreatic+insufficiency (Last accessed September 18, 2014). There is no indication in the medical records that Koziel had positive pancreatic insufficiency tests.

21.  Melena is defined as "the passage of dark-colored feces stained with blood pigments or with altered blood." Dorland's Illustrated Medical Dictionary, 1126 (32nd Ed. 2012).

22.  Hematochezia is defined as the "presence of blood in the feces." Id. at 831.

hematemesis,[23] dysuria,[24] pyuria,[25] hematuria,[26] joint pains, acholic[27] stools or dark urine." Id. Koziel admitted consuming large amounts of caffeine. Id. Nurse Askey noted that stool studies and celiac disease serology had been negative. Id. The results of a physical examination were completely normal, indicating that Koziel had a soft, non-tender abdomen, with normal active bowel sounds and without masses or organomegaly.[24] Tr. 241. He also had a negative Murphy's sign.[28] Id. Nurse Askey's impression was that Koziel suffered from diarrhea of an undetermined etiology and he ordered blood work, including a complete blood count, basic metabolic panel, and hepatic (liver) profile, and noted that Koziel would proceed with a colonoscopy

---

23. Hematemesis is defined as "the vomiting of blood." Id.

24. Dysuria is defined as "any difficulty of urination." Id. at 585.

25. Pyuria is defined as "the presence of pus in the urine." Id. at 1564.

26. Hematuria is defined as "blood (erthrocytes) in the urine." Id. at 834.

27. Acholia is defined as the "absence of bile." Id. at 14.

24. Organomegaly is defined as the "enlargement of an internal organ or organs." Id. at 1334.

28. The Murphy's sign is "a test for gallbladder disease in which the patient is asked to inhale while the examiner's fingers are hooked under the liver border at the bottom of the rig cage. The inspiration causes the gallbladder to descend onto the fingers, producing pain if the gallbladder is inflamed. Deep inspiration can be very much limited." Mosby's Medical Dictionary,___(8th Ed. 2009), http://medical-dictionary.thefree dictionary.com/Murphy's+sign (Last accessed September 18, 2014).

with biopsies to rule out microscopic colitis (inflammation of the colon). Tr. 242. Nurse Askey advised Koziel to avoid caffeine and prescribed the medication Levbid.[29] Id.

The results of a colonoscopy performed on October 6, 2010, by Kevin Carey, M.D., at the Guthrie Endoscopy Clinic, located in Sayre revealed a normal ileum and a diminutive polyp in the mid-ascending colon, which was removed, examined microscopically and found to be benign.[30] Tr. 235-239. Biopsies of the colon did not reveal microscopic colitis. Tr. 239. Koziel did, however, suffer some complications from the colonoscopy. Tr. 250. On October 8, 2010, he visited the emergency department of Endless Mountain Health Systems Hospital in Montrose complaining of rectal bleeding. Id. He was admitted to the hospital and then subsequently transferred to the Robert Packer Hospital in Sayre where he remained until his discharge from that facility on October 11, 2010. Tr. 255. Koziel's discharge diagnosis was "acute blood loss anemia secondary to bleed[ing] from a polypectomy site." Id. Koziel was prescribed the medication Levsin (Levbid) .375 mg to be taken every 12 hours as needed and

---

29. Levbid (generic hyoscyamine) is used to treat "certain stomach, intestinal, and bladder control conditions, including spasms. It is used to control stomach secretions and cramps. . . It works by decreasing the motion of muscles in the stomach, intestines, and bladder. It also decreases the production of stomach acid." Levbid, Drugs.com, http://www.drugs.com/cdi/levbid -extended-release-tablets.html (Last accessed September 18, 2014).

30. It was reported that the polyp was so small that it could not "even [be] measured." Tr. 250.

advised to take Imodium, one tablet three time per day as needed. Id.  He was also advised to follow-up with his primary care physician, Dr. Dana. Id.

On October 18, 2010, Koziel had the follow-up appointment with Dr. Dana at which Koziel reported that he was doing well other than some "pain off and on." Tr. 234. The results of a physical examination performed by Dr. Dana were completely normal, indicating that Koziel's abdomen was soft and non-tender, with normal bowel sounds and no organomegaly or masses felt. Id. Dr. Dana's diagnostic assessment was that Koziel suffered from chronic diarrhea, a dental abscess, anxiety and depression although there was no mention of Koziel reporting a dental problem or anxiety or depression. Id. Furthermore, Dr. Dana did not record any objective mental status findings. Id.  Dr. Dana prescribed the drug Celexa[31] and referred Koziel to an oral surgeon. Id.

Koziel did not return to see Dr. Dana until February 17, 2011. Tr. 306.  In the interim, Koziel commenced receiving psychiatric therapy and treatment.

At the appointment with Dr. Dana on February 17th Koziel reported that he was doing well other than continuing to have diarrhea and  "persistent pain off and on." Id.  The results of a physical examination were completely normal, indicating that

_____

31.  Celexa "is an antidepressant medication in a group of drugs called selective serotonin reuptake inhibitors (SSRIs)." Celexa, Drugs.com, http://www.drugs.com/celexa.html (Last accessed September 18, 2014).

Koziel's abdomen was soft and non-tender, with normal bowel sounds and no organomegaly or masses felt. Id.  Dr. Dana's diagnostic assessment was that Koziel suffered from chronic diarrhea. Id. Dr. Dana prescribed Lomotil (an anti-diarrheal medication) and Bentyl (an antispasmodic medication used to treat irritable bowel syndrome (IBS)). Id.  At an appointment with Dr. Dana on February 23, 2011, Koziel reported that he felt better. Tr. 304. The results of a physical examination were completely normal, including Koziel's abdomen was soft, non-tender with normal bowel sounds and no organomegaly or masses felt. Id.  Dr. Dana's diagnostic assessment was that Koziel was doing better but suffering from IBS and reported that Koziel had more formed stools than ever before, although he still had diarrhea. Id.

At an appointment with Dr. Dana on March 11, 2011, Koziel continued to feel better and was "doing ok." Id. Dr. Dana indicated that Koziel was "actually improving" and having more solid, formed stools. Id.  The results of a physical examination were completely normal, indicating that Koziel's abdomen was soft and non-tender, with normal bowel sounds and no organomegaly or masses felt. Id.  Dr. Dana's diagnostic assessment of IBS remained the same. Id.

When Koziel visited Dr. Dana on April 11, 2011, Koziel was feeling "much better" and Dr. Dana noted that his IBS was "much improved." Tr. 308. The physical examination findings and diagnostic assessment remained unchanged. Id.  Koziel continued to

20

do "okay" in May, 2011, but by September, 2011, Koziel reported
his medications were not helping as much. Tr. 307. At the
appointments in May and September, the physical examination
findings and diagnostic assessments remained the same. Id.

On November 15, 2011, Koziel was examined regarding his
complaints of diarrhea by Lynn S. Freeze, a certified registered
nurse practitioner, based on a referral from Dr. Dana. Tr. 345-
346.  Koziel told Ms. Freeze that he smoked 2-3 cigars per day,
rarely consumed alcoholic beverages and denied consuming caffeine
or ibuprofen products. Tr. 345. When Ms. Freeze reviewed Koziel's
systems, Koziel, inter alia, denied changes in mood, affect or
sensorium, denied muscle and joint pain, and denied any changes in
gait, balance or neurologic injuries. Tr. 346. The results of a
physical examination were completely normal, including that
Koziel's abdomen was soft and non-tender, with normal bowel sounds
and no organomegaly or masses felt. Id.  Ms. Freeze reported that
Koziel's mood was euthymic[32], his affect appropriate, his gait
normal, and that he was able to transfer from a sitting position
to the examination table without any assistance. Id.

A review of the administrative record reveals that the
last appointment Koziel had with Dr. Dana was on March 20, 2012,
at which Koziel continued to complain of "persistent pain off and

---

32.  Euthymic is defined as "pertaining to a normal mood in which
the range of emotions is neither depressed nor highly elevated."
Mosby's Medical Dictionary,___ (8th Ed. 2009), http://medical-
dictionary.thefreedictionary.com/euthymic (Last accessed
September 18, 2014).

on" and diarrhea. Tr. 340. The results of a physical examination were completely normal, indicating that Koziel's abdomen was soft and non-tender, with normal bowel sounds and no organomegaly or masses felt. Id.  Dr. Dana's diagnostic assessment was that Koziel suffered from IBS and chronic diarrhea, and although Dr. Dana did not report any objective mental status findings, he opined that Koziel suffered from anxiety, posttraumatic stress disorder and social behavioral issues. Id.  On the same day, Dr. Dana completed a disability questionnaire form for Koziel in which he indicated that Koziel would require unlimited access to a bathroom and need to use a bathroom 4-5 times per day. Tr. 341.

Koziel has a history of outpatient mental health treatment at NHS Northeastern.  Koziel underwent at least 50 sessions with a therapist and had regular appointments with Kenneth R. Lattimore, M.D., a psychiatrist.

The first record that we encounter is of a therapy appointment Koziel had with Christina Carter, a social worker, on October 25, 2010. Tr. 438.  A mental status examination of Koziel on that date revealed that he was appropriately groomed; his behavior was cooperative; his speech, affect and mood were normal; his thought processes were appropriate, and he had no suicidal or homicidal ideation. Id.  At this session there was a discussion of Koziel's "anger triggers" and one item mentioned was his so-called

adoptive mother.[33]  From November 15, 2010, through September 22, 2011, Koziel had 29 therapy appointments with Ms. Carter. Tr. 409-437.  The mental status examination findings reported by Ms. Carter at each of these appointments were the same as those reported at the appointment on October 25, 2010. Id.  These records also reveal that Koziel's anger problem ebbed and flowed, but, overall, he was able to manage it. Id.

From September 29, 2011, through June 15, 2012, Koziel had 21 therapy sessions with Ms. Carter. Tr. 366-408.  In the notes of these sessions Ms. Carter did not report any mental status examination findings. Id.  These records also revealed that Koziel's anger problem ebbed and flowed but, overall, he was able to manage it, and he also suffered from periodic depression and anxiety. Id.  Koziel first mentioned depression during these sessions on February 3, 2012, and anxiety on February 17, 2012. Tr. 382-385. At the last therapy session on June 15, 2012, Koziel reported that "he [had] been managing his anxiety well with his medication" and that "he [was] able to go into the public with his medication." Tr. 366.

On November 8, 2010, Koziel was evaluated by Dr. Lattimore with respect to complaints of anger control, anxiety and depression. Tr. 279-280. Dr. Lattimore reported that Koziel was

_____

33.  As stated earlier, Koziel was permitted to stay in a trailer located on the property of Thomas and Cindy Cantone. Koziel referred to Cindy Cantone as his adoptive mother although there is no legal or biological relationship between them. Tr. 30 and 43-45.

referred to him for an evaluation by "friends with whom [Koziel] now resides." Id.  Koziel told Dr. Lattimore that "he grew up in an extremely abusive family situation in which his father was a violent person who forced his mother to do sexual acts in view of the children" and that "[h]e was also physically abused by his father and his mother." Tr. 279. Koziel also reported that he had "lifelong difficulties with his temper." Id.  Dr. Lattimore also reported that Koziel was "presently living in a trailer behind his benefactor's home and she [the so-called adoptive mother] reports that when he becomes angry she sends him to his trailer to calm down." Id.  It was noted that Koziel never engaged in physically abusive behavior but that he gets "particularly upset about [Mrs. Cantone's] two small dogs yet he denies being jealous about the amount of time she spends with them." Id.  Koziel denied any bad dreams or flashbacks associated with the abuse he suffered as a child. Id.  Dr. Lattimore reported that Koziel was "quite socially awkward" and lost his job as a school custodian because of complaints from a female teacher regarding inappropriate behavior, i.e., "he had a way of walking up behind the female teachers quietly and observing them" and on one occasion "he apparently put his arm around a teacher[.]" Tr. 280-281.  A mental status examination performed by Dr. Lattimore revealed that Koziel was pleasant and cooperative, but made little eye contact. Tr. 279-280.  Koziel's thought processes were logical, coherent and goal-directed, and he "certainly" spoke "in a manner not consistent

with mental retardation." Id. Koziel was oriented to person, place and time, and he had no delusions, hallucinations or homicidal, suicidal or paranoid thoughts. Id. He was "quite humorous at times." Id. His attention, memory and concentration were fair, as was his insight and judgment. Id. Dr. Lattimore suspected that Koziel was of average intelligence with an extreme degree of social deprivation in childhood. Id. Dr. Lattimore's diagnostic assessment was that Koziel suffered from panic disorder with agoraphobia; depressive disorder, not otherwise specified; and avoidant personality disorder. Id. Dr. Lattimore gave Koziel a Global Assessment of Functioning (GAF) score of 50.[34] Id. Dr. Lattimore noted that Dr. Dana had started Koziel on the drug Celexa and that it was to early at that point to increase the dosage. Id.

At a return visit with Dr. Lattimore on December 6, 2010, Koziel reported that he had been doing "very well," but

---

34. The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3-32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id. A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. Id. A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id. A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. Id.

Koziel's so-called adopted mother who accompanied him reported
that at times he was extremely moody and that his moods were quite
unpredictable. Tr. 278. Koziel denied any suicidal or homicidal
thoughts. Id.  A mental status examination performed by Dr.
Lattimore revealed that Koziel's affect was reasonably appropriate
and he was alert and oriented to person, place and time; he had no
hallucinations or delusions, and his attention, memory and
concentration were fair. Id.  Dr. Lattimore's diagnostic
assessment was that Koziel suffered from panic disorder with
agoraphobia and depressive disorder, not otherwise specified. Id.
Dr. Lattimore increased Koziel's dosage of Celexa. Id.

      On January 10, 2011, Anthony Galdieri, Ph.D., a
psychologist, reviewed Koziel's medical records on behalf of the
Bureau of Disability Determination and found that Koziel suffered
from panic disorder with agoraphobia; depressive disorder, not
otherwise specified; and avoidant personality disorder. Tr. 227.
Dr. Galdieri, however, concluded that Koziel's mental conditions
did not meet or equal the requirements of any listed impairment.
Tr. 227 and 282-294. Dr. Galdieri also found that Koziel was only
moderately limited in his ability to (1) work in coordination with
or proximity to others without being distracted by them; (2)
interact appropriately with the general public; (3) accept
instructions and respond appropriately to criticism from
supervisors; (4) get along with coworkers or peers without
distracting them or exhibiting behavioral extremes; and (5)

26

respond appropriately to changes in the work setting. Tr. 225-226. Koziel had no other limitations according to Dr. Galdieri and opined that Koziel was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairment." Tr. 227.

From January 20, 2011, through March 2, 2012, Koziel had eight appointments with Dr. Lattimore. Tr. 327-334.  The mental status examination findings at each of these appointments were essentially the same: Koziel's affect was reasonably bright and appropriate or pleasant and cooperative and he responded appropriately to questions; he was alert and oriented in all spheres without evidence of a thought disorder; he had no suicidal or homicidal thoughts; and his attention, memory and concentration were reasonably adequate. Id.  Dr. Lattimore's diagnosis and plan of treatment also remained essentially the same throughout this period of time. Id.  Dr. Lattimore continued to treat Koziel with the drug Celexa but at the penultimate appointment on February 3, 2012, in addition prescribed the drug hydroxyzine.[35] Tr. 328. From January 20 through May 19, 2011, the diagnosis remained panic disorder with agoraphobia and depressive disorder, not otherwise specified, but on July 21, 2011, changed to merely depressive disorder, not otherwise specified; and then on October 13, 2011 through March 2, 2012, changed to depressive disorder, not

35.  Hydroxyzine (brand name Vistaril) is used to treat anxiety and tension. Hydroxyzine, Drugs.com, http://www.drugs.com/ hydroxyzine.html (Last accessed September 18, 2014).

otherwise specified, and intermittent explosive disorder.   Tr. 327-334.

No treating physician, psychiatrist or other medical provider submitted to the administrative law judge a work-related mental functional assessment indicating that Koziel was mentally disabled for the requisite twelve continuous months.[36]

**Discussion**

The administrative law judge at step one found that Koziel had not engaged in any substantial gainful activity since April 18, 2008, the alleged disability onset date. Tr. 14, 56-57 and 132.

At step two of the sequential evaluation process, the administrative law judge found that Koziel had the following

─────────────────────

36.   After the ALJ issued her decision, Koziel submitted to the Appeals Council a document entitled "Questionnaire - Mental" which was completed by Dr. Lattimore. Tr. 442-444. Evidence submitted after the administrative law judge's decision cannot be used to argue that the administrative law judge's decision is not supported by substantial evidence. Matthews v. Apfel, 239 F.3d 589, 594-595 (3d Cir. 2001).  The only purpose for which such evidence can be considered is to determine whether it provides a basis for remand under sentence 6 of section 405(g), 42 U.S.C. Szubak v. Secretary of Health and Human Servs., 745 F.2d 831, 833 (3d Cir. 1984).  Under sentence 6 of section 405(g) the evidence must be "new" and "material" and a claimant must show "good cause" for not having incorporated the evidence into the administrative record. Id.  The Court of Appeals for the Third Circuit explained that to be material "the new evidence [must] relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." Id.  Koziel has not explained, or even attempted to explain, how the evidence submitted to the Appeals Council provides a basis for a sentence 6 remand, including how he meets the "good cause" requirement.

severe impairments: "chronic diarrhea and anxiety disorder, (variously characterized)." Tr. 14. The administrative law judge indicated that "[d]uring any given encounter, mental health professionals have given the claimant various diagnoses and characterized his [] mental impairment in various ways. . .  By finding the claimant to have a 'severe' mental impairment however characterized, all symptoms affecting his [] mental functioning have been considered." Id.

At step three of the sequential evaluation process, the administrative law judge found that Koziel's impairments did not individually or in combination meet or equal a listed impairment. Id.  In so doing the administrative law judge reviewed Listing 5.06, Inflammatory Bowel Disease, and Listing 12.06, Anxiety Related Disorders.

Listing 5.06 requires a showing of inflammatory bowel disease with obstruction of narrowed areas in the small intestine or colon confirmed by appropriate medically acceptable imaging or in surgery, requiring hospitalization and occurring on at least two occasions at least 60 days apart within a consecutive 6-month period, or a showing of two of the following despite treatment within the same consecutive 6 month period: (1) anemia; (2) serum albumin of 3.0 g/dl on two evaluations at least 60 days apart; (3) tender abdominal mass palpable on physical examination present on two occasions at least 60 days apart and not completely controlled by narcotic medication; (4) perineal

29

disease with a draining abscess or fistula on at least two occasions 60 days apart; (5) involuntary weight loss of at least 10 percent from baseline present on two occasions at least 60 days apart; or (6) need for supplemental nutrition on a daily basis by way of a gastrostomy or venous catheter. No treating or examining physician stated that Koziel met the criteria of Listing 5.06 or any other physical listing and the bare medical records do not support such a finding.  The ALJ relying on Koziel's medical records found that Koziel did not meet Listing 5.06 because he did not have obstruction of narrowed areas of the small intestine or colon, or two of the alternative factors.

Listing 12.06, Anxiety Related Disorders, states as follows:

> 12.06 *Anxiety Related Disorders:* In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.
>
> A.  Medically documented findings of at least one of following:
>
> 1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
>
> a. Motor tension; or
> b. Autonomic hyperactivity; or
> c. Apprehensive expectation; or
> d. Vigilance and scanning;

or

2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity or situation; or

3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on average of at least once a week; or

4. Recurrent obsessions or compulsion which are a source of marked distress; or

5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.[37]

OR

C. Resulting in complete inability to function independently outside the area of one's home.

-------------------

37.  The term repeated episodes of decompensation, each of extended duration is defined in the regulations as "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." 20 C.F.R. Part 404, Subpart P, Appendix 1, Mental Disorders, 12.00 C. 4.

The ALJ found that Koziel did not meet the B criteria of Listing 12.06 because he had no restrictions of activities of daily living, mild to moderate difficulties of social functioning, no difficulties with concentration, persistence and pace, and no episodes of decompensation of an extended duration. Tr. 15-16. The administrative law judge further found that Koziel did not meet the C criteria because the medical evidence did not show a generalized persistent anxiety resulting in a complete inability to function independently outside the area of one's home. The ALJ noted that the fact that Koziel has the ability to drive and go out independently directly demonstrated that the C requirement of 12.06 was not met. The review by the court of the medical records reveals that no treating or examining physician stated that Koziel met the criteria of Listing 12.06 or any other mental health listing and the bare medical records do not support such a finding.

At step four of the sequential evaluation process the administrative law judge found that Koziel had the residual functional capacity to perform the full range of work at all exertional levels but with the following nonexertional limitations: (1) he would require access to a bathroom in the workplace; (2) he was limited to work involving simple instructions and retained the ability on a frequent basis to understand, carry out and remember those instructions; (3) he could respond appropriately to supervision, coworkers and usual

32

work situations on a frequent basis but not a constant basis; and (4) he could deal with changes in a routine work setting on a frequent basis but not a constant basis.[38] Tr. 16.  In setting this residual functional capacity, the administrative law judge considered Koziel's credibility, past work and his activities of daily living, and the records of the treating physical and mental health providers.  Tr. 16-19. The administrative law judge further noted that the work Koziel performed in 2008 ended only because the business closed not as a result of any impairment suffered by Koziel and that Koziel engaged in work activity after the alleged onset and even though that work was not at the substantial gainful activity level it indicated that Koziel's activities were, at times, somewhat greater than Koziel generally reported. Tr. 18.

The administrative law judge found that Koziel's statements concerning the intensity, persistence and limiting effects of his impairments were not credible to the extent that they were inconsistent with his ability to engage in the work as described above. Tr. 17.  The administrative law judge also considered the opinions of Dr. Galdieri noting that he found that Koziel was able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from

---

38.  The ability to engage in a particular activity during an 8-hour workday is rated as none, occasionally, frequently and constantly. Occasional is defined as up to 1/3 of an 8-hour workday; frequent as up to 2/3; and constant as 2/3 or more of the time.

his impairments and that Koziel would not be precluded from performing simple routine tasks. Tr. 18.  The administrative law judge gave significant weight Dr. Galdieri's opinion. Id.

Based on the above residual functional capacity and a review of Koziel's work history and the Dictionary of Occupational Titles the administrative law judge found at step four that Koziel could perform his prior work as a custodian. Tr. 19. Consequently, the administrative law judge found that Koziel was not disabled and the ALJ did not proceed to step five of the sequential evaluation process. Id.

The administrative record in this case is 444 pages in length, primarily consisting of vocational and physical and mental health records.  The administrative law judge did an adequate job of reviewing Koziel's medical history and vocational background in her decision. Tr. 11-20.

Koziel argues that the administrative law judge erred by (1) failing to assess all severe impairments and (2) failing to appropriately evaluate Dr. Lattimore's records and opinion. Koziel also generally argues that the administrative law judge's determination of Koziel's residual functional capacity is not supported by substantial evidence as well as her conclusion that Koziel could perform his prior relevant work as a custodian. We have thoroughly reviewed the record in this case and find no merit in Koziel's arguments.

34

The primary issue is whether or not substantial evidence supports the administrative law judge's decision that Koziel had the mental and physical ability to engage in simple work as custodian or janitor. No treating physician or psychiatrist or other mental health professional submitted to the administrative law judge a functional assessment of Koziel which indicated that he was functionally impaired from a physical or mental standpoint for the requisite continuous 12 month period.[39] However, the record does contain an assessment from a psychologist, Dr. Galdieri, which supports the administrative law judge's decision. The administrative law judge's reliance on the opinion of Dr. Galdieri was appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

Koziel contends that the administrative law judge failed to assess all of his severe impairments when she allegedly did not find that his depression, panic disorder with agoraphobia, intermittent explosive disorder, social disorder, and posttraumatic stress disorder were severe mental impairments.

---

39. To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).

The Social Security regulations contemplate the administrative
law judge considering whether there are any medically
determinable impairments and then when setting a claimant's
residual functional capacity considering the symptoms of both
medically determinable severe and non-severe impairments. 20
C.F.R. § 404.1529.  The determination of whether a claimant has
any severe impairments, at step two of the sequential evaluation
process, is a threshold test. 20 C.F.R. § 404.1520(c). If a
claimant has no impairment or combination of impairments which
significantly limit the claimant's physical or mental abilities
to perform basic work activities, the claimant is "not disabled"
and the evaluation process ends at step two. Id.  If a claimant
has any severe impairments, the evaluation process continues.  20
C.F.R. § 404.1520(d)-(g).  A failure to find a medical condition
severe at step two will not render a decision defective if some
other medical condition was found severe at step two.  However,
all of the medically determinable impairments both severe and
non-severe and their symptoms must be considered at step four
when setting the residual functional capacity.  The social
security regulations mandate such consideration. See 20 C.F.R. §§
404.1523 and 404.1545(a)(2); Boniella v. Comm'r of Soc. Sec., 390
F. App'x 122, 124 (3d Cir. 2010).

        In this case the court is satisfied that the ALJ
appropriately considered all of Koziel's impairments.  Dr.
Galdieri identified Koziel's medically determinable impairments

as panic disorder, depressive disorder and avoidant personality disorder but that even in light of those impairments Koziel still had the ability from a mental standpoint to engage in competitive work.  Even though the administrative law judge did not make a specific finding as to whether each of the impairments set forth in the record was medically determinable she found that Koziel had a severe anxiety disorder and acknowledged that there were several diagnoses evidenced by the record.  She further stated that she took into account "all symptoms affecting [Koziel's] mental functioning" and placed significant weight on Dr. Galdieri's opinion that Koziel could engage in competitive work. Tr. 14 and 18.  Under the circumstances of this case, the failure to delineate each and every medically determinable impairment, at most, was harmless error.  See Seaman v. Soc. Sec. Admin., 321 F. App'x 134, 135-36 (3d Cir. 2009); Enders v. Colvin, Civil No. 13-1987, slip op. at 45 n.28 (M.D.Pa. July 2, 2014)(Caldwell, J.)(applying harmless error analysis).

As for Koziel's chronic diarrhea, Koziel, for almost three years, was able to perform work as a custodian at a manufacturing plant.  That position only ended because the plant closed.  Koziel also worked as a custodian at a school.  Koziel reported that in both positions a bathroom was readily available and accommodated his need for frequent bathroom visits. Tr. 38-

39.[40] Under the circumstances, it was reasonable for the
administrative law judge to conclude that Koziel could perform
his prior relevant work as a school custodian and as a custodian
at a manufacturing plant, both positions involved simple, routine
work and there were bathroom facilities readily available.

         To the extent that Koziel argues that the
administrative law judge did not properly consider his
credibility, the administrative law judge was not required to
accept Koziel's claims regarding his mental and physical
impairments. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d
Cir. 1983)(providing that credibility determinations as to a
claimant's testimony regarding the claimant's limitations are for
the administrative law judge to make).  It is well-established
that "an [administrative law judge's] findings based on the
credibility of the applicant are to be accorded great weight and
deference, particularly since [the administrative law judge] is
charged with the duty of observing a witness's demeanor . . . ."
Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th
Cir. 1997); see also Casias v. Secretary of Health & Human
Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as
trier of fact, the individual optimally positioned to observe and

_____

40.  Koziel did indicate that he "did not get as much work [done]
as [he] was supposed to get done" but there is no indication that
his employer was dissatisfied with his performance or terminated
him because of his frequent bathroom visits.

38

assess the witness credibility."). Here, Koziel's medical records, continued part-time employment, and receipt of unemployment compensation benefits support the administrative law judge's credibility determination.  Because the administrative law judge observed and heard Koziel testify, the administrative law judge is the one best suited to assess Koziel's credibility.

We are satisfied that the administrative law judge appropriately considered all of the medical evidence and took into account all of Koziel's physical and mental limitations in the residual functional capacity assessment.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order follows.

_____
Yvette Kane
United States District Judge

Date: September 29, 2014

39